**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL NO. 1:07CV362**

| | |
|---|---|
| TERRAYLE FENDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | **MEMORANDUM AND** |
| ) | **O R D E R** |
| CVS PHARMACY, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on Defendant's motion for

summary judgment, opposed by Plaintiff. For the reasons set out below,

Defendant's motion is granted.

## I. PROCEDURAL AND FACTUAL HISTORY

On November 16, 2007, Plaintiff filed a complaint alleging claims for

relief under 42 U.S.C. § 12117(a) of the Americans with Disabilities Act of

1990 ("ADA"), under 42 U.S.C. § 2000e-5(f)(3) of Title VII of the Civil

Rights Act of 1964, and claims under North Carolina law for intentional

infliction of emotional distress and punitive damages. **Complaint, filed**

**November 16, 2007, at 6-10.** An amended complaint was filed on November 27, 2007, to include the electronic signature of Plaintiff's counsel and Plaintiff's signature on the verification page. **Amended Complaint, filed January 4, 2008.** Defendant CVS Pharmacy filed an answer on January 22, 2008. Following the close of discovery, Defendant filed a motion for summary judgment on September 2, 2008, and Plaintiff timely responded thereto. *See* **Defendant's Motion for Summary Judgment and Supporting Memorandum, filed September 2, 2008; Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, filed September 19, 2008; Defendant's Reply Brief, filed October 3, 2008.**

According to her complaint, Plaintiff was diagnosed with rheumatoid arthritis in 2004, a condition which "substantially limits one or more of her major life activities, including, but not limited to caring for herself, performing manual tasks, walking and working." **Complaint, at 1.** Plaintiff alleges that in 2005, while working as an assistant manager with CVS, she began to have physical difficulties associated with the rheumatoid arthritis. *Id*. **at 3.** Plaintiff claims she informed Defendant of her condition and Defendant initially responded by making "reasonable accommodations for

Plaintiff's disability." *Id*. **at 3-4.** Plaintiff contends, however, that while working as an assistant manager at a CVS store in Morganton, North Carolina, Defendant would no longer make reasonable accommodations for her arthritic condition and as a result she was forced to resign. *Id*. **at 4-5.** Plaintiff contends that after she was diagnosed with rheumatoid arthritis, she always informed her new employer of her condition on the first day of employment by either providing a doctor's note or verbally. **Deposition of Terrayle Fender, filed November 21, 2008, at 39.**[1]

Plaintiff testified that she has a 5 year-old child with her husband and a 13 year-old stepdaughter. *Id*. **at 7.** Plaintiff was home schooled and obtained her high school diploma in 2001, and then enrolled in Isothermal Community College where she took classes and received a certificate in finance. *Id*. **at 6-8.** Plaintiff enrolled at McDowell Technical College in August 2007 to pursue an associate degree in graphics and advertising. *Id*. **at 8.** Plaintiff attended classes four days a week and her goal was to

---

[1] Both parties submitted portions of the Fender Deposition to support their respective positions with regard to the Defendant's motion for summary judgment. However, the Court determined the entire transcript was needed in order to facilitate the rulings herein and requested the Defendant provide a copy of the entire deposition. *See* **Order, filed November 21, 2008.**

work as a freelance graphic designer following receipt of her associate degree. *Id*. at 9. Plaintiff testified she has completed two or three freelance jobs since she began her degree program. *Id*. at 10. Plaintiff often drives herself to campus and walks from her car to her classes.

Plaintiff was employed by Defendant CVS Pharmacy from November 17, 2003, until she resigned in February 2007. **Complaint, at 2.** Plaintiff worked in several CVS stores in Western North Carolina, including those located in Black Mountain, Asheville, Marion, and Morganton. Plaintiff worked as a cashier, photo lab supervisor and assistant store manager while employed by Defendant. **Fender Deposition, at 10-11**. As a photo lab supervisor, Plaintiff supervised other CVS photo technicians and was responsible for managing the day-to-day affairs of the photography department. *Id.* Plaintiff remained in this position until she was promoted to assistant store manager in August 2006. *Id*. at 11. After completing her training, Plaintiff was assigned to an assistant manager position at a CVS store on Leicester Highway, in Asheville, North Carolina. *Id.* Plaintiff's direct supervisor was store manager James Dale. Dale's supervisor was district manager Anthony Randolph. *Id*. at 12. Following this assignment, Plaintiff worked as an assistant manager in a CVS store on Hendersonville

Road in Asheville for "more than six months." *Id*. **at 13.** Plaintiff testified

she transferred to a CVS store in Morganton to work as assistant manager

after discussing this option with Frank Berkowitz, the district manager for

that area. *Id*. **at 14-15.** Plaintiff told Berkowitz that she was interested in a

promotion to store manager and there were no positions available in

Randolph's district. *Id*. **at 16.** Plaintiff's immediate supervisor in

Morganton was store manager David Wampler. *Id*. **at 18.**

Plaintiff testified she spoke with Wampler on her first day on the job

regarding her medical condition. *Id*. **at 39.** According to Plaintiff, she

advised him that she had rheumatoid arthritis and then explained what she

did to compensate for her illness and what he could do to help her. *Id*.

Plaintiff testified that "[e]ach store prior to Morganton was very kind in the

sense that they always offered me assistance, employees were very

reasonable and assisted me in many ways" and she could delegate tasks

that were too difficult to other employees. *Id*. **at 42.**

In her role as assistant manager in Morganton, Plaintiff handled "a lot

of store operations and responded to e-mails, filing, stocking, scheduling,

[and] working with employees." *Id*. **at 17-18.** While working as an

assistant manager with CVS, Plaintiff generally prepared her work

schedule with input from the store manager. *Id*. **at 18.** This practice continued for some time with Wampler, and Plaintiff was available to work any shift. *Id*. **at 18-19.** Initially, Plaintiff had no problems with Wampler as her supervisor, but that changed after two or three weeks of working for him. *Id*. **at 20.** Plaintiff testified that she began having communication difficulties with Wampler and he "just began to not really respond to me personally, started to lose that friend aspect" and ordered her, rather than asked her, to do certain tasks. *Id*. **at 20.** Plaintiff did not know what brought about the change in Wampler's demeanor towards her, but they "just began to butt heads a little bit." *Id*.

On or about November 9, 2006, Wampler informed Plaintiff that she was being demoted from assistant manager to shift manager. *Id*. **at 51.** Wampler explained that she was being demoted because she was not an "appropriate leader" to the other employees in the store. *Id*. **at 21-22.** Plaintiff testified that after her demotion she was informed she would be required to wear a blue shirt uniform worn by shift managers and that she could no longer delegate responsibility to other employees. *Id*. **at 22**. Plaintiff told Wampler she could not afford a cut in her pay and that she wanted to discuss the issue with Berkowitz, however Plaintiff was unable to

speak with Berkowitz until the following week.  *Id*. **at 23-24.**  Plaintiff also

told Wampler she would speak to Randolph and inquire about a possible

transfer back to his district.  *Id*. **at 52**.  After her discussion with Wampler,

Plaintiff testified that she became ill and went to the hospital complaining of

"heart palpitations and panic."  *Id*. **at 24.**  While in the hospital, Plaintiff

testified that she was prescribed medication for anxiety and that she had

not taken such medication before this incident.  *Id*. **at 29.**  Plaintiff was also

prescribed Wellbutrin for depression while at CVS and she continued to

take the medication "on and off" since leaving CVS.  *Id*.  Plaintiff testified

that she had seen a physician two or more times for anxiety and

depression since leaving CVS.  *Id*. **at 30.**

     Plaintiff testified that  Wampler told her not to return to work until she

had an opportunity to meet with Berkowitz regarding the demotion.  *Id.* **at**

**24.**  Plaintiff testified that when she met with Wampler and Berkowitz, they

insisted she sign papers stating she had quit her job when she left CVS

following her meeting with Wampler and that she had given Wampler her

store keys before leaving that day.  *Id*. **at 24-25, 62.**  Plaintiff admitted that

following the meeting where Wampler informed her of her demotion, she

told him that she "absolutely could not take that demotion."  *Id*. **at 25.**

Although Plaintiff later signed the documents admitting she had quit,
Plaintiff was rehired as an assistant manager. *Id*. **at 26 ("I was holding
that title, but not filling that role.").** On November 16, 2006, Plaintiff
signed an employee counseling form prepared by Berkowitz that described
her work performance as "Unsatisfactory" and indicated that she was
overstepping her assistant manager duties and not following directions. *Id*.
**at 54.** On or about November 20, 2006, Plaintiff sent an e-mail to
Berkowitz in order to "reach[ ] out to Mr. Berkowitz for some understanding,
some assistance" because she "was having so many problems in the store"
and she felt like he would help her. *Id*. **at 59.** Plaintiff testified her
demotion to shift manager was humiliating and she had lost all her dignity.
*Id*. **at 60.** Plaintiff wanted Berkowitz to either transfer her to another store
or to help her improve her relationship with the other employees, but
ultimately, Plaintiff testified, Berkowitz did not. *Id*. **at 61.**

After her return to work, Plaintiff was told she could no longer provide
direction to employees and she was to take all of her direction from shift
supervisor Linda McCoy. *Id*. **at 26.** Plaintiff did not suffer a pay cut or
reduction in benefits upon her return and she was still entitled to a bonus.
*Id*. **at 26-27.** Plaintiff no longer participated in choosing her work schedule

and Wampler scheduled her "open-to-close every day." *Id*. **at 27.** Plaintiff

typically worked 45-50 hours a week as an assistant manager, and she did

not have any physical difficulty working those hours. *Id*. **at 23.** However,

Plaintiff testified that when Wampler increased her hours by scheduling her

to open and close the store six days a week (roughly 84 hours per week),

she began to experience difficulties with her arthritis. *Id*. **at 23, 28.** Plaintiff

stated that this schedule continued for around six weeks until she went on

medical leave. *Id*. **at 28.** Plaintiff complained that the increase in work

hours rendered her physically incapable of completing all the tasks that

were asked of her. *Id*. **at 36.** When asked when she began working the

extended hours, Plaintiff testified first that she could not recall whether she

began working longer days before or after her promotion. *Id*. **at 88-89.**

Later, Plaintiff remembered that she began working longer hours after her

discussion regarding her demotion with Wampler, which was on or about

November 9, 2006. *Id*. **at 89.**

Plaintiff testified she requested medical leave from December 1,

2006, to January 15, 2007. *Id*. **at 67.** Plaintiff complained that she was

having problems with her joints and she did not return to work for CVS after

taking leave. *Id*. **at 52-53.** Plaintiff could not recall whether she ever

worked a day for CVS in December 2006. *Id*. **at 66.** Plaintiff contends

while she was on medical leave, she made several attempts to contact

Berkowitz to discuss returning as assistant manager, but she learned the

position had been filled. *Id*. **at 53.**

In February 2007, Plaintiff prepared a letter of resignation. "My doctor

has asked me to resign. He doesn't think I can handle the strain. I really

think it would be better for everyone. I think you would be happy with that

situation." *Id*. **at 36.** Plaintiff testified that her resignation was voluntary

and based on the recommendation of her physician. *Id*. **(Q: "Did you**

**resign voluntarily from your position at CVS? A: I did. Q: Was it in**

**fact based on a recommendation of your doctor? A: Yes, it was.").**

Plaintiff explained that because of the change in her work schedule, she

was suffering injuries and was physically incapable of performing some of

the tasks she was asked to complete. *Id*. Plaintiff testified that her illness

made it difficult for her "to lift heavy things, stand a lot, do small

operations." *Id*. **at 37**.

After leaving CVS, Plaintiff was employed as a store manager for

Family Dollar from April until August 2007. *Id*. **at 30.** Plaintiff testified that

she quit this position because she experienced a great deal of anxiety and

panic attacks that impaired her ability to function as manager. *Id.* **at 31.**

Plaintiff testified that the panic attacks were caused in part because she

feared that she would be treated badly at Family Dollar by fellow

employees and ultimately fired. *Id.* Plaintiff testified that she received such

treatment from employees at CVS and she feared the same would occur at

Family Dollar. *Id*. Plaintiff's duties with Family Dollar were similar to her

duties as assistant manager for CVS and she testified she had no problem

performing her duties aside from the anxiety and panic attacks. *Id*. **at 95-**

**96.**

Further facts will be set out as needed herein.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of

material fact, and judgment for the moving party is warranted as a matter of

law. **Fed. R. Civ. P. 56(c).** "A genuine issue [of fact] exists 'if the evidence

is such that a reasonable jury could return a verdict for the nonmoving

party.'" ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (quoting**

***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).** In

considering a motion for summary judgment, the Court is required to view

the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.*

By reviewing substantive law, the Court may determine what matters constitute material facts. ***Anderson*, 477 U.S. at 248.** "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "The party seeking summary judgment has the initial burden to show a lack of evidence to support the nonmoving party's case." ***Shaw*, 13 F.3d at 798.** If that showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat a motion for summary judgment. *Id.*

Accordingly, in considering the facts of the instant case for purposes of this motion, the Court will view the record in the light most favorable to Plaintiff, the nonmoving party.

## III.  DISCUSSION

### A.  Plaintiff's Claims under the ADA

Defendant CVS contends that Plaintiff's ADA claims for constructive discharge and failure to make reasonable accommodation must fail as a

matter of law.  Based on a careful examination of the evidence that includes  affidavits, Plaintiff's deposition, and examination of the pleadings filed in this matter, the Court concludes that Defendant's motion for summary judgment on the ADA claims should be granted.

The *McDonnell Douglas* framework applies to Plaintiff's ADA claims. ***Runnebaum v. NationsBank of Maryland, N.A.*, 123 F.3d 156, 164 (4th Cir. 1997) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).**  Under the *McDonnell Douglas* framework, Plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence.  ***Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).**  If Plaintiff is successful in proving her *prima facie* case, the burden then shifts to the Defendant to offer a legitimate, nondiscriminatory reason for any alleged adverse employment action.  *Id*.  If Defendant successfully meets this burden, then the Plaintiff must "bear[ ] the ultimate burden of proving that she has been the victim of intentional discrimination."  *Id*. **(citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-08 (1993)).**  "In general terms, a plaintiff establishes a *prima facie* case by proving a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it

is more likely than not that the adverse employment action was the product of discrimination." *Id.* **(citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).**

In order to establish a *prima facie* case, Plaintiff must show by a preponderance of the evidence (1) that she is in a protected class under the ADA; (2) she was constructively discharged; (3) that at the time of constructive discharge, "she was performing her job at a level that met her employer's legitimate expectations; and (4) the constructive discharge "occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Id.* Because the Court finds Plaintiff has failed to offered evidence sufficient to show that she is disabled and, therefore, in a protected class under the ADA, it is unnecessary to examine the remaining three elements.

Disability under the ADA is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." **42 U.S.C. § 12102(2)(A)-(C)**. The ADA "contemplates a case-by-case determination of whether a given impairment substantially limits one or more of the major life activities of the individual."

*Runnebaum*, 123 F.3d at 166 (citing *Ennis*, 53 F.3d at 59-60). Thus, a determination of whether or not a claimant has a disability must be made on an individualized basis. *Id.* These three elements under the ADA are examined collectively in light of the evidence most favorable to Plaintiff.

Plaintiff contends that her rheumatoid arthritis is a disabling impairment under the ADA.[2] In her complaint, Plaintiff alleges that her rheumatoid arthritis substantially limits one or more of her major life activities that includes, among others, the ability to care for herself, perform manual tasks, walk, and work. **Complaint, at 1**. In resolving the issue of disability, the "courts need only consider whether the impairment at issue substantially limits the *plaintiff's* ability to perform one of the major life activities contemplated by the ADA." *Runnebaum*, **123 F.3d at 170 (emphasis added).** "The term 'major life activities' refers to 'those activities that are of central importance to daily life.'" *Rohan v. Networks Presentations, LLC*, 375 F.3d 266, 274 (4th Cir. 2004) (quoting *Toyota*

---

[2]The Court finds that rheumatoid arthritis falls within the definition of impairment under the ADA. *See Moore v. J.B. Hunt Transp. Inc.*, **221 F.3d 944, 951 n.3 (7th Cir. 2000).** Assuming Plaintiff does suffer from rheumatoid arthritis, the remaining inquiry will be to determine whether this condition substantially impairs Plaintiff's ability to engage in one or more major life activities.

***Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002))**.

Working is included among these major life activities. ***See Williams v.***

***Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996);**

***see also* 29 C.F.R. § 1630.2(i) (2000) (EEOC regulations setting out**

**other "major life activities" that include "functions such as caring for**

**oneself, performing manual tasks, walking, seeing, hearing, speaking,**

**breathing, learning, and working.")**. "The phrase 'substantially limits' sets

a threshold that excludes minor impairments from coverage under the

ADA." ***EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001).**

Plaintiff has the burden of proving that her rheumatoid arthritis substantially

limited any of her major life activities, whether such activity is work, caring

for oneself, or performing manual tasks, "in a manner different from the

average person." ***Id.* at 352-53 (citing *Pack v. Kmart Corp.*, 166 F.3d**

**1300, 1306 (10th Cir. 1999) and *Colwell v. Suffolk County Police Dep't*,**

**158 F.3d 635, 644 (2d Cir. 1998)).**

Plaintiff contends she was diagnosed with rheumatoid arthritis in

2004 and this condition substantially limited one or more of her major life

activities. **Complaint, at 1.** The evidence before the Court does not support

this claim for the time period in question, that is, from 2004 until February

2007 when Plaintiff resigned from her position at CVS.[3]  Plaintiff testified

that immediately after she received a diagnosis of rheumatoid arthritis, she

informed her district manager, Anthony Randolph, and provided him with

her doctor's statement.  **Fender Deposition, at 81-82.**  Randolph recalled

only one instance where Plaintiff reported for work wearing a brace on her

wrist and her doctor placed a temporary lifting restriction due to that injury,

which he accommodated.  ***See* Exhibit 4, Affidavit of Anthony Randolph,**

***attached to* Defendant's Brief in Support of Summary Judgment, ¶ 4**.

When asked whether she provided any other doctor statements to

Defendant regarding her condition or limitations, Plaintiff testified that

although she could not recall the exact contents or the dates of such

statements, she knew the physician's statements provided information to

her employer that would have excused her from work in order to keep the

---

[3] Plaintiff discusses in great detail the alleged deterioration in her condition as a result of her arthritis following her resignation not only in the complaint but also in her brief opposing summary judgment and her supporting affidavit. However, evidence regarding her subsequent condition is only relevant if it relates to the claims in her complaint and the corresponding time periods.  ***See Cortes v. McDonald's Corp*., 955 F. Supp. 541, 547 (E.D.N.C. 1996).**

doctor's appointment.  **Fender Deposition, at 81-82.**[4]  Plaintiff also

answered the following question during her deposition:

> Q:    I understand the diagnosis that you're saying you
> gave to Anthony Randolph. Other than those documents, did
> you ever provide anyone in management at CVS with additional
> information, a diagnosis, concerning your arthritis or
> fibromyalgia?
>
> A:    No.

*Id*. **at 82.**  Affidavits submitted by Frank Berkowitz and David Wampler, the

two other managers for CVS, in addition to Randolph's affidavit, completely

disavow any knowledge or perception that Plaintiff ever presented with

"any impairment that caused her to be substantially limited in her ability to

take care of herself, work, walk, perform manual tasks, or engage in any

other fundamental activity."  **Randolph Affidavit,** *supra*, **¶ 4;** *see also*

**Exhibit 3, Affidavit of David Wampler,** *attached to* **Defendant's Brief,**

*supra*, **¶ 4; Exhibit 2, Affidavit of Frank Berkowitz,** *attached to*

**Defendant's Brief,** *supra*, **¶ 4.**  These affidavits demonstrate personal

---

[4]An examination of the record reveals that no doctor's note or medical records of any kind have been submitted by Plaintiff in this matter nor has Plaintiff submitted any deposition testimony or affidavits from co-workers, family members, or medical professionals regarding her alleged rheumatoid arthritis and any limiting conditions. ***See* Fed. R. Civ. P. 56(e)(2).**

knowledge from Plaintiff's managers that supervised her from some time in 2004 until February 2007.  Indeed, Plaintiff's own testimony regarding her employment with Defendant greatly undermines her claim of disability under the ADA.  For instance, Plaintiff testified that she routinely worked 45-50 hours while employed by Defendant with no associated physical limitations or complications.  **Fender Deposition, at 23.**  After Plaintiff resigned from CVS in February 2007, she went to work as a store manager for Family Dollar in April 2007 and remained there until August 2007.  **Id. at 30.**  Plaintiff's duties as store manager of Family Dollar included payroll, hiring and firing, delegating daily tasks to subordinates, running the front of the store, and opening and closing the store.  **Id. at 95.**  Plaintiff testified that the work was similar to the work she had performed at CVS and she had no problems performing her duties as manager.  **Id. at 95-96.**

Plaintiff testified she resigned from her Family Dollar position because she was experiencing a high level of anxiety as well as panic attacks; however, she does not allege she was having difficulty performing her duties because of her arthritis.  **Id. at 31.**  According to Plaintiff, the anxiety was similar to that she experienced at CVS in the fall of 2006 when Wampler informed Plaintiff and other employees in the Morganton store

about her demotion. *Id*. Plaintiff testified that Wampler "stated in a group store meeting to the other employees that they were no longer to refer to me as assistant manager or take any instruction from me." *Id*. Plaintiff explained that the demotion was humiliating and resulted in poor communication with her fellow employees. *Id.* However, these changes in responsibility would be consistent with a demotion from a supervisory role and in no way concern alleged discrimination under the ADA. Moreover, Plaintiff does not claim her anxiety caused a disability under the ADA.

Plaintiff's claims mainly center on Wampler's actions, and to a lesser degree those of Berkowitz, in allegedly forcing her to work open-to-close six days a week and the adverse impact that schedule had on her disability. However, in considering the three elements set forth out under the ADA, Plaintiff's ADA claim must fail. **See 42 U.S.C. § 12102(2)(A)-(C).** The evidence shows that Plaintiff could work 45-50 hours a week and manage a store both before and after her resignation. Thus, Plaintiff has failed to demonstrate evidence that one or more of her "major life activities" pled in her complaint – caring for herself, performing manual tasks, walking, and working – were substantially limited by a physical impairment. Likewise, the evidence of record fails to demonstrate that there was a

record of such physical impairment or that Defendant regarded Plaintiff as having an impairment. Based on these findings, Plaintiff's has failed to prove a *prima facie* case and her claim for constructive discharge must fail.

Plaintiff's claim that Defendant did not provide reasonable accommodation must likewise fail. The Court has concluded that Plaintiff did not have a physical impairment such that she qualified as disabled under the ADA. An employer is required to make "reasonable accommodations to the known physical . . impairments . . of an otherwise qualified individual with a disability who is . . . an employee." **42 U.S.C. § 12112(b)(5)(A).** The evidence does not show that the Defendant regarded Plaintiff as having a disability; likewise, there is no evidence to demonstrate that the Plaintiff suffered from a disability under the ADA.


## B. Plaintiff's Pendent State Law Claim

Plaintiff pleads a claim for intentional infliction of emotional distress under North Carolina law contending that "Defendant's conduct in this action to prey upon this Plaintiff's medical condition of rheumatoid arthritis in a successful effort to force her to quit constitutes outrageous conduct." **Plaintiff's Opposition to Summary Judgment, at 19-20;** *see* **Complaint,**

*supra*.  To prevail on this claim, Plaintiff must prove that Defendant's "'conduct exceeds all bounds usually tolerated by decent society' and the conduct 'causes mental distress of a very serious kind.'"  ***Stanback v. Stanback*, 297 N.C. 181, 196 (1979) (quoting Prosser, *The Law of Torts*, § 12, at 56 (4ᵗʰ ed. 1971)).**  It is certainly understandable that Plaintiff suffered from anxiety and mental anguish when she was demoted and subsequently resigned.  However, such personnel decisions by Defendant do not qualify as "outrageous conduct" or that which would cause "mental distress of a very serious kind."  After considering the record as a whole, the Court concludes that Defendant is entitled to summary judgment on this issue and likewise on any issue of punitive damages as it relates to liability for intentional infliction of emotion distress.

## C. Punitive Damages

Plaintiff has failed to carry her burden of establishing liability in this matter. Therefore, the claim for punitive damages for alleged violation of the ADA must fail.  The Court has already concluded that Plaintiff did not suffer from a disability as that term is defined under the ADA.  ***See* 42 U.S.C. § 12102(2)(A)**. Moreover, Plaintiff has failed to demonstrate a

record of suffering from an impairment or that Defendant regarded her as having such impairment. *See* **§ 42 U.S.C. § 12101(2)(B) & (C).** Therefore, Defendant's motion for summary judgment on the issue of punitive damages is granted.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's motion for summary judgment is hereby **GRANTED.**

A Judgment dismissing this action in its entirety is filed herewith.

Signed: December 16, 2008

Lacy H. Thornburg
United States District Judge